[Civ. No. 134.   Fifth Dist.   June 21, 1962.]

ARGONAUT INSURANCE COMPANY, Petitioner, v. IN-
DUSTRIAL ACCIDENT COMMISSION and KATH-
ERINE G. WARREN, Respondents.

Edmund D. Leonard for Petitioner.

Everett A. Corten, Rupert A. Pedrin, Edman & Sanderson,
Leland M. Edman and Oren, McCartney & Sells for Re-
spondents.

CONLEY, P. J.—The Argonaut Insurance Company seeks annulment of an award made by the Industrial Accident Commission to Katherine G. Warren as the widow of Benjamin Maurice Warren. He was employed as a laborer at Modesto and sustained a fall in the course of an altercation with a fellow employee, which resulted in injuries disabling him and ultimately causing his death on December 4, 1960. The Argonaut Insurance Company was the workmen's compensation insurance carrier for Warren's employer, a copartnership consisting of Fred and Howard Rumsey, doing business as Rumsey Tent and Awning Company. Following the employee's injury and prior to his death, the respondent Katherine G. Warren, alleging herself to be his wife, filed a claim as guardian *ad litem* on his behalf against the employer and the petitioner with the respondent Industrial Accident Commission. Following his death, she was substituted in the proceeding as his alleged widow.

The petitioner raises only one point, a matter of law, alleging that the award was unwarranted because the respondent Mrs. Warren was not legally married to the decedent. The contention turns entirely on the fact that their marriage license as issued was incorrect in that assumed names were substituted for the true names of the parties.

The factual background of the application of Mr. and Mrs. Warren for their license is as follows: Prior to February 11, 1936, Katherine G. Warren, then Katherine Gray Swegart, resided in Fresno, having recently secured a divorce from her first husband. For some time following her divorce from Swegart she had consorted with the decedent, who also lived in Fresno. Shortly before February 11, 1936, it became obvious that Mrs. Swegart was pregnant by Mr. Warren, the child later being stillborn. To save themselves embarrassment, particularly as Mrs. Swegart had a number of her children living with her, the two went to Hanford, in Kings County, and there applied for and secured a marriage license under assumed names. Mrs. Swegart used the name "Katherine Ruth Hopkins," and Mr. Warren stated to the county clerk that his name was "Maurice Jones."

The sole question to be determined is whether or not the fact that the license was incorrect in form invalidated the marriage. The marriage admittedly was "solemnized, authenticated, and recorded" as required in Civil Code section 68. The award made by the commission is based upon its finding that the marriage was valid. In the early case of *People* v.

*Stokes,* 71 Cal. 263 [12 P. 71], the Supreme Court held that a valid marriage could be effected under an assumed name, saying at page 265:

"The marriage was a valid marriage, even if the parties gave the wrong names to the preacher, or the latter mistook the names. Men and women are conjoined in matrimony, and a defendant charged with bigamy or adultery cannot in this country base a defense on the ground that he or his wife was married under an assumed name, not his or her real name. In such case evidence of the real names does not *contradict* the certificate, since the minister or other person authorized to perform the marriage ceremony is not required to guarantee the fact that the persons married were married in their true names."

And this rule is stated generally in 32 California Jurisprudence 2d, Marriage, section 20, page 348, as follows: ". . . there is no objection, as far as the validity of the marriage is concerned, to a marriage under an assumed name."

The petitioner questions the applicability of the *Stokes* case, because at the time it was decided section 68 of the Civil Code provided that ". . . noncompliance with its provisions does not invalidate any lawful marriage," and petitioner argues that by the later change of the wording of section 68 the Legislature inferentially intended a different rule to apply.

Petitioner's theory is that because of the provisions of sections 68 and 69 of the Civil Code, at the time the marriage license was issued by the County Clerk of Kings County and the giving of false names by the applicants to the clerk, the marriage license was void and that consequently the purported marriage was invalid.

Section 68 of the Civil Code then read: "Marriage must be licensed, solemnized, authenticated, and recorded as provided in this article; *but noncompliance with its provisions by others than a party to a marriage does not invalidate it.*" (Emphasis added.)

Section 69 of the Civil Code at the time of the issuance of the license provided as follows: "All persons about to be joined in marriage must first obtain a license therefor, from the county clerk of the county in which the marriage is to be celebrated, which license must show:

"1. The identity of the parties.

"2. Their real and full names, and places of residence.

"3. Their ages; and

"4. Whether white, Mongolian, Negro, Malayan or mulatto.

"No license may be granted when either of the parties, applicants therefor, is an imbecile, or insane, or is at the time of making the application, or proofs herein required, for said license, under the influence of any intoxicating liquor, or narcotic drug; and no license may be issued authorizing the marriage of a white person with a Negro, mulatto, Mongolian or member of the Malay race. If the male is under the age of twenty-one years, or the female is under the age of eighteen years, and such person has not been previously married, no license may be issued by the county clerk unless the consent in writing of the parents of the person under age, or one of such parents, or of his or her guardian, is presented to him, duly verified by such parents, or parent, or guardian; and such consent must be filed by the clerk, and he must state such facts in the license. For the purpose of ascertaining all the facts mentioned or required in this section, the clerk, at the time the license is applied for may, if he deems it necessary in order to satisfy himself as to matters in this section enumerated, examine the applicants for a license on oath, which examination shall be reduced to writing by the clerk, and subscribed by them.

"Application for a marriage license must be made at least three days and not more than thirty days, before the license shall be issued, upon a form which the county clerk shall furnish without charge. One of the parties to the marriage must sign the application before the county clerk; the other party need not appear in person at the time of making the application but must sign the application before some officer authorized by law to administer oaths and such officer shall take the acknowledgment of such signature without charge. Upon the expiration of three days and not later than thirty days after receipt of the application, duly executed and signed, the clerk may issue the license. The application shall be substantially in the following form: Application for License to Marry.

"Notice is hereby given that _____ a native of _____ of the age of _____ years, residing at (full address to be inserted), and _____ a native of _____ of the age of _____ years, residing at (full address to be inserted), intend within thirty days from date hereof, to apply to the county clerk of _____ County, State of California, for license to marry."

It is clear that a license must be obtained by the parties, except in the special situation dealt with by section 79 of the Civil Code, and that there must be a solemnization, to effect a valid marriage under present law in California. (*Estate of Abate,* 166 Cal.App.2d 282, 292-293 [333 P.2d 200]; *Norman* v. *Norman,* 121 Cal. 620 [54 P. 143, 66 Am.St. Rep. 74, 42 L.R.A. 343]; *Estate of Shipp,* 168 Cal. 640 [144 P. 143]; *Temescal Rock Co.* v. *Industrial Acc. Com.,* 180 Cal. 637 [182 P. 447, 13 A.L.R. 683].)

It will be noted that the Legislature expressly provided that noncompliance with the provisions of section 68 by others than the parties to a marriage does not invalidate a marriage. As the law requires the county clerk to issue the marriage license in proper form and the inaccuracy of the license here in question constituted a noncompliance by the clerk, we should not be compelled to go further in order to declare the marriage valid.

In *Johnson* v. *Alexander,* 39 Cal.App. 177, 179 [178 P. 297], it is said: "By section 69 of the Civil Code, the duty of the county clerk is clearly defined, but we are of the opinion that if he fails in this, either wilfully or through mistake, and issues the license to a female under the age of eighteen years without the consent of parent or guardian, and the marriage is afterward solemnized, that such marriage is not void or voidable because of the failure of the clerk to perform his duty as prescribed." (See also *People* v. *Lininger,* 22 Cal.App.2d 440, 441 [71 P.2d 306]; *Estate of Cooper,* 97 Cal.App.2d 186, 192 [217 P.2d 499].)

However, petitioner argues that the clerk's action was the result of his reliance upon misinformation deliberately given to him by the parties and that the license and the marriage based upon it should therefore be declared void. Unquestionably, the Legislature can prescribe the essentials of a valid marriage and can expressly declare void any marriage which is contracted contrary to the requirements of the law. The Legislature has done this with respect to incestuous and bigamous marriages (Civ. Code, §§ 59, 61), and attempted to secure the same result by the enactment of an unconstitutional section of the Civil Code with respect to miscegenous marriages. (Civ. Code, former § 60: *Perez* v. *Sharp,* 32 Cal.2d 711 [198 P.2d 17].) The Legislature has not expressly declared void a marriage under a license which is erroneous due to the furnishing of incorrect or misleading information to a county clerk. But the peti-

tioner argues that by providing in section 68 of the Civil Code that noncompliance with its provisions by others than a party to a marriage does not invalidate it, the law inferentially holds that the furnishing of false information by one or both of the parties to the county clerk who issues the license constitutes noncompliance with the legal requirements by a party to the marriage with the necessary result that the license and the marriage are rendered void.

In view of the policy of the law to promote and protect the marriage relationship, it cannot be held that the Legislature meant to declare by inference an additional ground upon which a marriage must be found void. If petitioner's theory should be upheld, the misstatement of her age by a female applicant for a license (Civ. Code, § 69, subd. 3), or the giving of a wrong residence address (Civ. Code, § 69, subd. 2) would invalidate countless marriages already solemnized in this state and would, among other results, affect the marital status of the parties, their property rights and rights of inheritance; it would also vitally affect the criminal liability of persons indulging in bigamous unions. It cannot be asumed that the Legislature intended by inference that such results should follow.

While the word "must" is used in the code sections in question, the employment of that word does not necessarily and *ipso facto* make statutory provisions mandatory. (*Rutledge* v. *City of Eureka,* 195 Cal. 404, 424 [234 P. 82]; *Skelly Estate Co.* v. *City & County of San Francisco,* 9 Cal.2d 28, 33 [69 P.2d 171]; *Cake* v. *City of Los Angeles,* 164 Cal. 705, 709 [130 P. 723]; *Estate of Mitchell,* 20 Cal.2d 48, 51 [123 P.2d 503]; *Garrison* v. *Rourke,* 32 Cal.2d 430, 437 [196 P.2d 884].)

We think that it is inconceivable that the Legislature intended to enact by inference a rule that the giving of incorrect names by the applicants for a license would make void the subsequent license and the marriage of the parties. We hold that the Warrens were validly married.

Our conclusion is fortified by decisions in other states and by general treatises on the subject.

In 55 Corpus Juris Secundum, Marriage, section 25, at page 859 it is said: ". . . the fact that the license was wrongfully obtained does not render the marriage void, as, for example, where the license was obtained by fraud or perjury, although it may subject the parties to the pains and penalties of the law."

In *Christensen* v. *Christensen,* 144 Neb. 763 [14 N.W.2d 613, 616], the Supreme Court of Nebraska states: ". . . the fact that the license required was wrongfully or fraudulently procured may subject the parties to the pains and penalties of the law for violation thereof, but it does not alone affect the validity of the marriage itself. [Citations.]"

*In re Kinkead's Estate,* 239 Minn. 27 [57 N.W.2d 628, 634], held that: "In the absence of a legislative declaration to the contrary, the validity of a marriage is not affected by the fact that the marriage license was obtained by fraud or perjury." (See also *Switchmen's Union of N.A.* v. *Gillerman,* 196 Mich. 141 [162 N.W. 1024, 1025]; *Johnson* v. *Johnson,* 214 Minn. 462 [8 N.W.2d 620, 623]; *Johnson* v. *Johnson* (N.D.) 104 N.W.2d 8, 18, 82 A.L.R.2d 1029; 35 Am.Jur., Marriage, § 23, pp. 195, 196.)

The award is affirmed.

Brown, J., and Stone, J., concurred.