OPINION
{¶ 1} Appellant, William E. Bevan ("Biff"), appeals from the judgment of the Lake County Court of Common Pleas, Domestic Relations Division, finding that he had contracted a common law marriage with appellee, Patricia S. Bevan ("Patricia"), and ordering him to pay spousal support. We affirm.
 {¶ 2} Patricia filed for divorce March 17, 2003. Biff answered March 20, 2003, denying the existence of a marriage. The case was referred to the magistrate. The proceedings were bifurcated. First, extensive briefing and a hearing were conducted to determine if a common law marriage existed. November 20, 2003, the magistrate filed his decision finding the couple to have been married since July 7, 1977. Biff objected. Hearing on the objections was held by the trial court, which issued its judgment adopting and approving the magistrate's decision March 9, 2004. This judgment was superseded by a nunc pro tunc entry filed April 15, 2004, correcting a date.
 {¶ 3} Next, briefing and a hearing were conducted before the magistrate to determine the amount of spousal support, if any, and the division of marital assets and debts. The magistrate issued his decision August 18, 2004, finding that Biff should pay Patricia $550 per month, plus poundage, for six and one-half years. Biff objected. December 30, 2004, the trial court filed its judgment entry of divorce. The trial court largely adopted the magistrate's decision, but modified Biff's support obligation to $856.47 per month, plus poundage, for the first three years.
 {¶ 4} This appeal timely followed. Biff makes two assignments of error:
 {¶ 5} "[1.] Whether the trial court erred to the prejudice of the appellant when it determined that a common law marriage was established on July 7, 1977.
 {¶ 6} "[2.] Whether the trial court erred to the prejudice of the appellant when it awarded appellee spousal support for a period of seventy-eight (78) months."
 {¶ 7} In 1976, Patricia was married to Philip J. Ruggiero, with whom she had a daughter, Michelle. Biff was their neighbor. Patricia and Biff fell in love. Patricia's marriage to Philip was dissolved in September 1976. Evidently, Patricia and Biff moved in together sometime in 1977. July 7, 1977, they took a trip to Niagara Falls. Patricia testified at the first hearing that she considered herself married to Biff when they began cohabitating, and that the Niagara trip was their honeymoon. She admitted to thinking, that, someday, she and Biff would be "legally" married. She further admitted that she and Biff never solemnized their marriage since she felt that he just wanted to cohabitate as husband and wife. She legally changed her name to Bevan in 1992.
 {¶ 8} Patricia also relied on the testimony of her daughter, Michelle Cieslewski, one of Michelle's former babysitters, Rhonda Johnston, and her cousin, Wanda Williams, to establish the existence of the marriage. Michelle testified that she considered Biff her stepfather, and that he often introduced Patricia and Michelle as his "wife" and "kid." On cross examination, Michelle seemed to admit she knew Biff had once asked Patricia to marry him legally, and that Patricia refused. Michelle also admitted that she would have been upset if Patricia and Biff had formally married.
 {¶ 9} Rhonda Johnston testified that she understood the couple to be married, that Patricia used the name "Bevan," and that the community in their home of Fairport Harbor considered the couple married. She stated that Patricia always referred to Biff by his name, or as "my husband."
 {¶ 10} Wanda Williams also testified that she understood the couple to be married, and that this was the understanding generally of their friends and of the community. She said that Patricia usually called Biff her husband.
 {¶ 11} Biff testified that he and Patricia were simply cohabitating. He stated that he asked her to marry him, probably in 1978, and that she refused, not wanting to have a different name than her daughter.
 {¶ 12} Biff's mother, Marilyn Bevan, testified that she always believed that her son and Patricia were simply boyfriend and girlfriend.
 {¶ 13} Documentary evidence was also submitted regarding the marriage. This included correspondence from Biff's former employer, dated 1982, addressed to Mr. and Mrs. William Bevan; a 1986 letter from Biff's grandmother addressed to Biff and Pat Bevan; and a 1990 Christmas card from Biff's sister naming Patricia as "Aunt" Pat Bevan. Letters from the couple's landlord from 1987 and 1989 indicated he thought them married. Patricia was listed as Biff's spouse on his health plan from 1990 on. They filed tax returns as husband and wife in 1991, 1999, 2000 and 2001. Starting around 1996, the couple maintained joint checking and saving accounts. They obtained a joint Mastercard in 2003.
 {¶ 14} In his decision regarding spousal support, the magistrate found that Patricia, age fifty-four, had been a part-time employee at Walmart for many years, with gross wages of $14,000 to $16,000 per year, and no health coverage. He determined that this represented her earning ability, pursuant to R.C. 3105.18(C)(1)(b). He found that Biff, age forty-nine, was a longtime ODOT employee, who made almost $40,000 per year, with state employee benefits, and that this represented his earning ability. All of these findings were accepted by the trial court. Its modification of Biff's support obligation for the first three years, adding $306.47 to his monthly payments, seems to relate directly to the figure Patricia will have to pay to retain her state-sponsored health insurance under COBRA. She will not be eligible for COBRA coverage after three years.
 {¶ 15} By his first assignment of error, Biff attacks the finding of a common law marriage between himself and Patricia.
 {¶ 16} "A common law marriage is the marital joinder of a man and a woman without the benefit of formal papers or procedures. Such marriages are not favored in Ohio, but have long been recognized as lawful if certain elements or circumstances are found to be present." Nestor v. Nestor (1984),15 Ohio St.3d 143, 145.
 {¶ 17} "An agreement of marriage in praesenti when made by parties competent to contract, accompanied and followed by cohabitation as husband and wife, they being so treated and reputed in the community and circle in which they move, establishes a valid marriage at common law * * *." Umbenhower v.Labus (1912), 85 Ohio St. 238, at the syllabus; accord Nestor
at 145.
 {¶ 18} "The fundamental requirement to establish the existence of a common law marriage is a meeting of the minds between the parties who enter into a mutual contract to presently take each other as man and wife. The agreement to marry inpraesenti is the essential element of a common law marriage. Its absence precludes the establishment of such a relationship even though the parties live together and openly engage in cohabitation. Although cohabitation and reputation are necessary elements of a common law marriage, this court has previously held that standing alone they do not constitute a common law marriage. [Citation omitted.]
 {¶ 19} "The contract of marriage in praesenti may be proven either by way of direct evidence which establishes the agreement, or by way of proof of cohabitation, acts, declarations, and the conduct of the parties and their recognized status in the community in which they reside. However, all of the essential elements to a common law marriage must be established by clear and convincing evidence. [Citation omitted.]
 {¶ 20} "Where there is no direct proof in reference to the formation of the contract of marriage in praesenti, testimony regarding cohabitation and community reputation tends to raise an inference of the marriage. * * * The inference is generally strengthened with the lapse of time during which the parties are living together and cohabitating as man and wife." Nestor at 146.
 {¶ 21} There is no necessity that everyone in the community regard a couple as man and wife to establish a common law marriage: the "reputation" of being married need only exist in a couple's circle of acquaintances. Nestor at 146. Pursuant to R.C. 3105.12(B)(1), common law marriages occurring after October 10, 1991, are not recognized in Ohio. In re Estate of Little
(Nov. 17, 1999), 9th Dist. C.A. No. 19396, 1999 Ohio App. LEXIS 5415, at 3-4. "However, common law marriages that occurred prior to that date are recognized as valid and shall remain so until terminated by death, dissolution, divorce, or annulment. R.C. 3105.12(B)(2)." Id. at 4.
 {¶ 22} The standard of review applicable to this issue is abuse of discretion. Bradley v. Bradley (July 5, 2001), 8th Dist. No. 78400, 2001 Ohio App. LEXIS 3028, at 4. "The term abuse of discretion connotes more than an error of law or judgment. It implies that the court's attitude is unreasonable, arbitrary or unconscionable." Id.
 {¶ 23} In support of his first assignment of error, Biff notes not only his own denial of marriage to Patricia (a denial supported by his mother), but certain discrepancies in the testimony of Patricia and her daughter, Michelle. Patricia admitted that she thought someday she and Biff would be "legally" married, and that Biff only wished to cohabitate as husband and wife. Michelle seemed to admit she knew Biff had asked her mother to marry, around 1978, and that her mother demurred. Biff postulates that these discrepancies bar a finding that Patricia has proved each element of a common law marriage by clear and convincing evidence, as required by Nestor. "Clear and convincing" evidence is that degree of proof, not necessarily conclusive, which nevertheless produces in the mind of the trier of fact a firm belief or conviction in the facts sought to be established. Summers v. Summers (July 6, 1988), 2d Dist. No. 2352, 1988 Ohio App. LEXIS 2722, at 10.
 {¶ 24} We respectfully disagree. There is some direct proof of the essential element of a common law marriage, i.e., a contract to marry in praesenti. This is Patricia's assertion that the July 7, 1977 trip to Niagara Falls was a honeymoon, and that she considered herself Biff's wife thereafter. And the great balance of the remaining evidence shows the existence of the marriage. The parties cohabitated for twenty-six years. The testimony of Michelle, Rhonda Johnston, and Wanda Williams indicates that Patricia and Biff held themselves out as married, and were reputed amongst their circle of acquaintances and the community in which they lived to be married. The documentary evidence from the years prior to October 1991 indicates a marriage: letters were addressed to the couple as husband and wife; and, Biff listed Patricia on his health insurance as his wife.
 {¶ 25} The trier of fact is charged with determining the weight and credibility of witnesses, and is free to believe all, part, or none of the testimony presented to it. Sulfridge v.Kindle, 4th Dist. No. 04CA795, 2005-Ohio-3929, at ¶ 20. The test for determining the existence of a common law marriage is fact specific. In this case, the trier of fact was the magistrate; and, the trial court conducted a full review of his decision upon Biff's objections. The evidence of a common law marriage between Patricia and Biff, as it appears in the record, is not beyond a reasonable doubt — but that is not the standard of proof. The evidence produced in the minds of the magistrate and the trial court a firm belief that a marriage existed, which meets the standard of clear and convincing evidence. Nothing in the record shows that this conviction on the part of the magistrate and the trial court was unreasonable, arbitrary, or unconscionable.
 {¶ 26} Consequently, the first assignment of error is without merit.
 {¶ 27} By his second assignment of error, Biff attacks both the amount and duration of spousal support awarded. He argues that Patricia, in failing to seek full-time employment until the summer of 2004, has underutilized her earning ability, in contravention of R.C. 3105.18(C)(1)(b). He also argues that an award of six and one-half years of support imposes on him an undue financial hardship, in contravention of R.C.3105.18(C)(1)(i).
 {¶ 28} A trial court enjoys broad discretion in awarding spousal support under R.C. 3105.18(C)(1). Gordon v. Gordon,
11th Dist. No. 2004-T-0153, 2006-Ohio-51, at ¶ 13. The award will not be disturbed on appeal absent an abuse of discretion. Id.
 {¶ 29} There is no duty to make a reasonable effort to secure employment as a prerequisite to spousal support. Haninger v.Haninger (1982), 8 Ohio App.3d 286, 287. "The correct concept in determining alimony is that each party must be deemed employed to the extent of his or her earning capacity in the absence of evidence that such employment cannot be obtained." Id. "`Earning ability' involves both the amount of money one is capable of earning by his or her qualifications, as well as his or her ability to obtain such employment." Id. at 288.
 {¶ 30} In this case, the magistrate determined that Patricia and Biff were meeting their earning abilities. He noted that Patricia had worked part-time for Walmart for twelve years, and that there was no testimony that fulltime employment with Walmart, or in some other position, was readily available to her. As he further noted, his award of $550 per month left Biff with some 60 percent of the couple's after tax income. The effect of the trial court's upward adjustment of support for the first three years is, more or less, to equalize the parties' incomes.
 {¶ 31} Further, length of the marriage is a factor to be considered under R.C. 3105.18(C)(1)(e), when awarding spousal support. This marriage lasted twenty-six years. Altogether, there is nothing in the amount of support awarded indicating the trial court abused its discretion.
 {¶ 32} Similarly, we find no abuse of discretion in the duration of the spousal support award. Six and one-half years is long — but not compared to a marriage of twenty-six years. Indeed, in a marriage of long duration, the trial court may decline to establish any termination date for support. Gordon
at ¶ 18. Biff is correct in asserting that an award of spousal support must take into account the obligor's ability to pay, and should not unduly burden him or her. See, e.g., Thompson v.Thompson (Apr. 21, 1994), 8th Dist. No. 64894, 1994 Ohio App. LEXIS 1695, at 12. But an award imposing some financial hardship on the obligor does not constitute an abuse of discretion.Coleman v. Coleman (June 3, 1992), 9th Dist. No. 15329, 1992 Ohio App. LEXIS 2963, at 2-3.
 {¶ 33} Consequently, the second assignment of error is without merit.
 {¶ 34} The judgment of the Lake County Court of Common Pleas, Domestic Relations Division, is affirmed.
Cynthia Westcott Rice, J., concurs, Diane V. Grendell, J., concurs in judgment only.